1
2
3
4
5
6
7
8
9

UNITED STATES  DISTRICT COURT

10

Northern District of California

11

San Francisco Division

12    CHIEN VAN BUI, et al.,                              No. C 11-04189 LB

13                          Plaintiffs,              **AMENDED[1] ORDER GRANTING IN PART AND DENYING IN PART**

14            v.                                     **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

15    CITY AND COUNTY OF SAN
      FRANCISCO, et al.,                              [Re: ECF No. 81]

16
                             Defendants.
17    _____/

18                                     **INTRODUCTION**

19        In this civil rights action, Chien Van Bui and Ai Huynh (collectively, "Plaintiffs"), the parents of

20    decedent Vinh Van Bui, known as Tony Bui ("Bui"), sued San Francisco Police Officers Austin

21    Wilson ("Officer Wilson") and Timothy Ortiz ("Officer Ortiz"), and the City and County of San

22    Francisco ("CCSF") (collectively, "Defendants") for the death of their son.  Complaint, ECF No. 1.[2]

23    Defendants move for summary judgment.  Motion, ECF No. 81.  The court held a hearing on the

24

25    _____

26        [1] The court issues this amended order primarily to clarify certain citations to the record, the
      evidence the court considered when making its decisions, and the court's reasoning regarding its
27    denial of qualified immunity.

28        [2] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
      generated page numbers at the top of the document.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    matter on June 26, 2014.  6/26/2014 Minute Order, ECF No. 136.  Upon consideration of the

2    admissible evidence submitted, the arguments of counsel, and the applicable authority, the court

3    **GRANTS** summary judgment in favor of Defendants with respect to Plaintiffs' *Monell* claim and

4    otherwise **DENIES** Defendants' motion.

5                                        **STATEMENT**

6    **I.  FACTS**

7         Defendants Austin Wilson ("Officer Wilson") and Timothy Ortiz ("Officer Ortiz") were police

8    officers with the San Francisco Police Department ("SFPD") and employed by the City and County

9    of San Francisco ("City").  Joint Statement of Undisputed Facts ("UF"), Fact 1.  At all times

10   relevant to this action, they were acting in the course and scope of their employment with the SFPD.

11   UF, Fact 1.

12        On December 29, 2010, Officer Wilson and Officer Ortiz were in uniform and driving a marked

13   police car.  UF, Fact 1.  Officer Wilson was 6' tall and weighed 198 pounds, Wilson Depo. 2 at

14   69:18-70:1, Schwartz Decl., Ex. Q, ECF No. 121-17, and Officer Ortiz was 5'9" tall and weighed

15   between 175 and 185 pounds, Ortiz Depo. 2 at 104:19-22, Schwartz Decl., Ex. L, ECF No. 121-12.

16   Police Inspector Kevin Whitfield, who is not a defendant to this action, also was working that day.

17   UF, Fact 1.  Vinh Van Bui, known as Tony Bui ("Bui"), lived at 629 Bacon Street, San Francisco, a

18   flat which he shared with several family members, including his sisters Cindy Thanh Tran ("Tran")

19   and Lan Herrera ("Herrera"), Herrera's daughter Melina H., his father Plaintiff Chien Van Bui

20   ("Chien Van Bui") and his mother Plaintiff Ai Huynh ("Huynh").  UF, Fact 2.  Bui, who was 46

21   years old and was 5'6" tall and weighed 135 pounds, suffered from a mental condition and was

22   easily agitated by loud noises.  UF, Fact 4; Marvin C. Depo. at 20:16-22, Schwartz Decl., Ex. B,

23   ECF No. 121-2; Autopsy Report, Schwartz Decl., Ex. CC, ECF No. 121-29 at 2.  Specifically, Bui

24   had suffered from schizophrenia since at least 1995, Chien Van Bui Depo. at 42:9-25, Schwartz

25   Decl., Ex. A, ECF No. 121-1; Medical Records at 87-89, Schwartz Decl., Ex. AA, ECF No. 121-27,

26   and since 1997, as a side effect of his antipsychotic medication, he also suffered from tardive

27   dyskinesia (i.e. "late-onset abnormal movement"), Shyn Depo. at 33:20-34:17, 38:21-39:7, Schwartz

28   Decl., Ex. N, ECF No. 121-14; Medical Records at 282, Schwartz Decl., Ex. AA, ECF No. 121-27,

which sometimes caused his trunk and extremities to rock involuntarily and also caused him to sometimes walk slowly, one step at a time, Marvin C. Depo. at 75:23-77:12, Schwartz Decl., Ex. B, ECF No. 121-2; Shyn Depo. at 33:20-34:17, 34:21-36:1, 38:21-39:7, 51:14-53:16, 57:14-20, Schwartz Decl., Ex. N, ECF No. 121-14; Tran Depo. at 21:110, 24:22-25:14, 34:24-35:4, Schwartz Decl., Ex. O, ECF No. 121-15. Bui did not have a criminal record. Tran Decl. ¶ 4, ECF No. 104.

On the afternoon of December 29, 2010, Melina H., who was then 15 years old, had approximately 15 of her teenaged friends over at her home at 629 Bacon Street. UF, Fact 3. Sharon H. was one of these friends. UF, Fact 3. At some point in time, Sharon H. entered the bathroom and slammed the door behind her, which startled and agitated Bui. UF, Fact 4; Sharon H. Depo. at 20:3-6, Schwartz Decl., Ex. I, ECF No. 121-9. When Sharon H. came out of the bathroom and was going to the kitchen, Bui stuck her in the lower back with an X-Acto knife, which had a blade that was approximately 1 inch long. UF, Fact 5; Sharon H. Depo. at 25:6-26:16, 72:20-73:18, Connolly Decl., Ex. N, ECF No. 91; Wilson Depo. at 70:13-17, Schwartz Decl., Ex. Q, ECF No. 121-17; Wilson Decl., Ex. A (photograph of the X-Acto knife). The other teenagers told Sharon H. that she was bleeding and apparently injured. Sharon H. Depo. at 27:8-28:8, Connolly Decl., Ex. N, ECF No. 91. Melina H. then telephoned her mother (Herrera), who was not at the house, and told her that "Tony [Bui] cut Sharon [H]." UF, Fact 6. Herrera told Melina H. to call "911." UF, Fact 7. Melina H. called 911 and reported: "We have a man that's like mental here and just slapped somebody—one of my friends, and yeah, we need him out." UF, Fact 8.

911 Dispatch broadcasted to SFPD officers in the field that Bui had "just slapped [Melina H.'s] friend" and that the "reporting party" said Bui was "mentally challenged." UF, Fact 9. Moments later, Melina H. clarified, telling the 911 operator the following: "[Bui] has like a mini, a little mini like knife thing. It's sharp. And when [her friend] came out [of the bathroom], he said 'Do you want me to stab you?' and he hit her with the little pointy thing. . . . She's bleeding. Yeah, he stabbed her." UF, Fact 10. Based on this additional information, 911 Dispatch broadcasted: "Subject has a pointed object that he stuck the victim with in the back." UF, Fact 11. 911 Dispatch also transmitted through the computer-assisted dispatch system that Bui had "stabbed [Melina H's] friend" and was "mentally challenged," that Melina H. was "not sure if [Bui] has the knife," and that

UNITED STATES DISTRICT COURT
For the Northern District of California

1  the injury was "minor." UF, Fact 11; Borg Decl., Ex. J, ECF No. 94-10.  911 Dispatch also sent to

2  the police vehicle computer the following text: "TX: Susp is Toni who is mentally challenged."

3  Wilson Depo. at 42:5-15, Schwartz Decl., Ex. Q, ECF No. 121-17.  When responding to the

4  dispatch, Officers Ortiz and Wilson had access to the dispatch information through a vehicle

5  computer, working radios and, as to Officer Wilson, an earpiece, Ortiz Depo. at 32:22-25, 54:17-23,

6  80:10-17, Schwartz Decl., Ex. L, ECF No. 121-12; Wilson Depo. at 32:12-19, Schwartz Decl., Ex.

7  Q, ECF No. 121-17; Ortiz Decl. ¶ 10, ECF No. 82; Wilson Decl. ¶ 14, ECF No. 84, but Officers

8  Ortiz and Wilson and Inspector Whitfield say they did not know at that time that Bui had mental

9  health problems, Ortiz Decl. ¶ 10, ECF No. 82; Whitfield Decl. ¶ 14, ECF No. 83, Wilson Decl. ¶

10  10, ECF No. 84.

11      At about 3:53 p.m., Officers Ortiz and Wilson arrived at 629 Bacon Street.  UF, Fact 12.

12  Inspector Whitfield also responded, arriving at 629 Bacon Street at about the same time as Officers

13  Ortiz and Wilson.  UF, Fact 13.  The parties dispute whether the officers treated the call as an

14  emergency.  Plaintiffs say that the officers did not and provide evidence that the officers' sirens and

15  lights were off, the officers were not running, and the officers did not discuss tactics when

16  approaching the flat.  Ortiz Depo. at 45:13-20, 48:18-25, 55:11-14, Schwartz Decl., Ex. L, ECF No.

17  121-12; Wilson Depo. at 55:19-21, 58:1-8, 66:25-68:24, Schwartz Decl., Ex. Q, ECF No. 121-17.

18  Defendants, on the other hand, provide evidence that the 911 call was classified as an "A

19  priority" call, giving it the highest priority, Goley Depo. at 17:20-18:14, Connolly Reply Decl., Ex.

20  D, ECF No. 129-4 at 17:20-18:14; Borg Decl., Ex. B, ECF No. 94-2; Borg Decl., Ex. J, ECF No. 94-

21  10, and that the officers responded, at least initially, to the call as a "Code 3"—with their lights and

22  sirens on, Ortiz Decl. ¶ 2, ECF No. 82; Wilson Decl. ¶ 2, ECF No. 84.  Their guns were holstered,

23  Ortiz Decl. ¶ 8, ECF No. 82; Wilson Decl. ¶ 7, ECF No. 84, they had pepper spray and batons on

24  their persons, and they also had an Extended Range Impact Weapon ("ERIW")—a shotgun that

25  shoots bean bags—in their car, Ortiz Depo. at 28:2-4, 46:4-12, Schwartz Decl., Ex. L, ECF No. 121-

26  12; Wilson Depo. at 35:18-37:4, Schwartz Decl., Ex. Q, ECF No. 121-17.

27      The officers either knocked on the door or rang the doorbell, and one of the teenagers at Melina

28  H.'s get-together, Aaron L., opened the door and allowed the officers into the house.  UF, Fact 14.

1    Upon entering, Officers Ortiz and Wilson and Inspector Whitfield saw a group of teenagers in the

2    living room, and at least one officer asked whether anyone had been stabbed.  UF, Fact 15; UF, Fact

3    16; Ortiz Decl. ¶¶ 4-6, ECF No. 82; Whitfield Decl. ¶ 4, ECF No. 83; Jason W. Depo. at 33:10-24,

4    Connolly Decl., Ex. H, ECF No. 88; Sharon H. Depo. at 36:11-20, Connolly Decl., Ex. N, ECF No.

5    91; Marvin C. Depo. at 40:24-41:9, 42:7-13, 73:20-24, Connolly Decl., Ex. J, ECF No. 89; Tran

6    Depo. at 13:9-11; 14:10-15:17, Connolly Decl., Ex. P, ECF No. 92-1; Ortiz Depo. at 49:5-12,

7    Schwartz Decl., Ex. L, ECF No. 121-12.  Initially, no one in the room acknowledged that anyone

8    had been stabbed, no one appeared to be in distress, and Bui's sister, Tran, the only adult present,

9    said nothing had happened. UF, Fact 16; Ortiz Decl. ¶ 5, ECF No. 82; Sharon H. Depo. at 39:1-6,

10   Connolly Decl., Ex. N, ECF No. 91; Ortiz Depo. at 49:13-22, Schwartz Decl., Ex. L, ECF No. 121-

11   12.  Tran may also have told the police officers to leave.  *See* Sharon H. Depo. at 39:3-40:2,

12   Connolly Decl., Ex. N, ECF No. 91; Sharon H. Depo. at 66:11-16, Schwartz Decl., Ex. I, ECF No.

13   121-9; Whitfield Depo. at 62:7-16, Schwartz Decl., Ex. P, ECF No. 121-16; Tran Decl. ¶ 2, ECF No.

14   104; *but see* Tran Depo. at 14:2-17:15, 57:15-20, 58:20-23, Connolly Reply Decl., Ex. P, ECF No.

15   129-16 at 14:2-17:15.  No one had yet informed Tran that anyone had been stabbed, that Melina H.

16   had called the police, or why Melina H. had done so. UF, Fact 19.  Relying on the information that

17   Tran provided to him (i.e., that nothing had happened), Officer Ortiz radioed Dispatch at 3:45:43

18   p.m. and stated that the call had "no merit."  UF, Fact 17.

19        Thereafter, Inspector Whitfield again asked the group of teenagers if anyone had been "stabbed."

20   Whitfield Decl. ¶ 5, ECF No. 83.  This time, Sharon H. was pointed out as having been cut, and she

21   raised her hand in confirmation.  UF, Fact 20.  Inspector Whitfield asked Sharon H. where she had

22   been stabbed, and she showed him the injury on her back, which Inspector Whitfield describes as a

23   "puncture wound." UF, Fact 21.  Tran heard Inspector Whitfield confirm with Sharon H. that she

24   had been stabbed.  UF, Fact 22.  Inspector Whitfield's observation of the puncture wound confirmed

25   that a stabbing or other such injury had occurred, but Sharon H. stated that she was not hurt and did

26   not need a paramedic.  Whitfield Decl. ¶¶ 5-6, ECF No. 83; Whitfield Depo. at 45:6-8, Schwartz

27   Decl., Ex. P, ECF No. 121-16.  Officers Ortiz and Wilson saw Sharon H. lift her shirt and point to

28   her back, and Officer Ortiz saw a wound on her back, which looked to him like a fresh cut.  Ortiz

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Decl. ¶ 6, ECF No. 82; Wilson Decl. ¶ 6, ECF No. 84.  Having confirmed that Sharon H. had been

2   stabbed, Officers Ortiz and Wilson asked with urgency the location of the man with the knife. Ortiz

3   Decl. ¶ 6, ECF No. 82; Whitfield Decl. ¶ 6, ECF No. 83; Wilson Decl. ¶ 6, ECF No. 84; Tran Depo.

4   at 14:10-15:22, Connolly Decl., Ex. P, ECF No. 92-1; Marvin C. Depo. at 41:3-15, Connolly Decl.,

5   Ex. J, ECF No. 89.  Certain people in the house informed Officers Ortiz and Wilson that Bui was in

6   the house, by either pointing down the hall or telling the officers.  UF, Fact 25.

7       Hearing that a stabbing had occurred, seeing the wound, and hearing that the perpetrator was in

8   the house corroborated for the officers that a crime had been committed and that the suspect was

9   located on the premises.  Ortiz Decl. ¶ 6, ECF No. 82; Whitfield Decl. ¶ 6, ECF No. 83; Wilson

10  Decl. ¶ 6, ECF No. 84.  The officers did not know at that time whether Bui still possessed the X-

11  Acto Knife.  Ortiz Depo. at 59:20-22, Schwartz Decl., Ex. L, ECF No. 121-12.  As they advanced,

12  Tran tried to inform the officers again of Bui's mental illness, and Plaintiffs say that the officers

13  shoved her aside.  Marvin C. Depo. at 70:25-71:20, Schwartz Decl., Ex. B, ECF No. 121-2; Melina

14  H. Depo. at 69:6-12, 71:1-25, Schwartz Decl., Ex. H, ECF No. 121-8; Aaron L. Depo. at 21:13-17,

15  21:25-22:2, 25:7-11, 39:14-19, Schwartz Decl., Ex. K, ECF No. 121-11; Simon P. Depo. at 26:2-9,

16  26:24-27:19, 42:3-6, Schwartz Decl., Ex. M, ECF No. 121-13; Tran Depo. at 16:1-15, 17:7-15,

17  55:2-9, Schwartz Decl., Ex. O, ECF No. 121-15; Sandra W. Depo. at 70:22-71:3, 76:15-20,

18  Schwartz Decl., Ex. T, ECF No. 121-20; Tran Decl. ¶ 3, ECF No. 104.  In any case, Officer Ortiz

19  and Officer Wilson say that they do not recall Tran telling them that Bui was mentally ill.  Ortiz

20  Depo. at 54:17-55:8, 56:24-57:10, Schwartz Decl., Ex. L, ECF No. 121-12; *but see* Tran Depo. at

21  16:7-10, 17:23-24, Schwartz Decl., Ex. O, ECF No. 121-15 (testifying that one of the officers told

22  her that he knew Bui was mentally ill).  Officers Ortiz and Wilson did not develop a plan to extract

23  Bui from the bathroom.  Ortiz Depo. at 55:11-14, Schwartz Decl., Ex. L, ECF No. 121-12; Wilson

24  Depo. at 96:17-97:11, Schwartz Decl., Ex. Q, ECF No. 121-17.

25      Officers Ortiz and Wilson walked down the hallway toward the bathroom, looking for Bui.  UF,

26  Fact 26.  Officers Ortiz knocked on the bathroom door and ordered Bui out.  Ortiz Decl. ¶ 7, ECF

27  No. 82; Melina H. Depo. at 75:18-24, Schwartz Decl., Ex. H, ECF No. 121-1; Sharon H. Depo. at

28  38:6-23, 40:14-19, Schwartz Decl., Ex. I, ECF No. 121-9; Andrew K. Depo. at 32:24-33:4, Schwartz

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Decl., Ex. J, ECF No. 121-10; Simon P. Depo. at 26:5-9, Schwartz Decl., Ex. M, ECF No. 121-13;

2   Jason W. Depo. at 37:2-6, Schwartz Decl., Ex. R, ECF No. 121-18.  Soon therafter, the bathroom

3   door opened inward, and Bui emerged with the X-Acto knife in his hand.  UF, Fact 26; see Wilson

4   Decl., Ex. A, ECF No. 84-1 (photographs of the X-Acto knife).  Officers Ortiz and Wilson then

5   pulled out their guns and pointed them at Bui.  UF, Fact 28.

6        The parties agree about the following facts leading to Bui's shooting.  After the officers pulled

7   out their guns and pointed them at Bui, they warned him to drop the knife.  UF, Fact 29.  Bui did not

8   drop the knife.  *Id.*  Bui advanced down the hallway while Officers Ortiz and Wilson continued to

9   order Bui to drop the knife.  UF, Fact 30.  The officers backed up somewhere in the living room.  UF,

10  Fact 31.  Bui did not stop.  UF, Fact 32.  The officers shot three times at Bui.  UF, Fact 33. Two of

11  the shots hit Bui, who was injured fatally.  UF, Fact 36.

12       The parties otherwise dispute much of what happened from the time that Bui opened the

13  bathroom door to the moment he was shot.  According to Plaintiffs, Bui had the X-Acto knife down

14  by his side.  Melina H. Depo. at 78:12-14 ("[Bui] started walking out really slowly.  I saw the X-

15  Acto knife; it was by his side."), 79:9-11 ("[Bui] was walking very slowly, with his X-Acto knife by

16  his side . . . ."), 79:22-25 ("[T]he police were backing up really fast, and [Bui] was, like, going

17  extremely, like, slow, walking, and with the thing on his side . . . ."), Schwartz Decl., Ex. H, ECF

18  No. 121-8; Tran Depo. at 21:11-22:1 ("And then he had his hand down.  His hand never moved.  He

19  did not move his hand at all.  He did not have any action that says he's trying to provoke the

20  police."), 69:23-70:5 ("Q: Did it appear to you that [Bui] was pointing whatever it was that you saw

21  in his hand toward the police officers?  A: No.  I don't think he ha[d] any action to say that he's

22  trying to attack the police.  Q: Was he pointing the object in his hand at the police officers or not?

23  A: No, no.  Never.  I didn't see."), Schwartz Decl., Ex. O, ECF No. 121-15.  Plaintiffs say that Bui,

24  with the X-Acto knife still by his side, began to slowly shuffle down the hall and toward the officers

25  and the front door of the flat.  Marvin C. Depo. at 76:6-77:10 (Bui shuffled), Schwartz Decl., Ex. B,

26  ECF No. 121-2; Melina H. Depo. at 78:4-81:7 (Bui walked extremely slowly down the hall and

27  toward the officers and the front door, and he had the knife at his side), Schwartz Decl., Ex. H, ECF

28  No. 121-8; Simon P. Depo. at 44:6-18 (Bui walked slowly toward the officers), 57:19-58:1 (Bui

C 11-04189 LB
ORDER

7

1 advanced slowly toward the officers), Schwartz Decl., Ex. M, ECF No. 121-13; Tran Depo. at

2 20:22-22:4 (Bui moved slowly), 62:11-20 (Bui walked very slowly out of the bathroom), 63:15-17

3 (Bui walked very slowly toward the officers), 65:21-66:2 (Bui's hands were straight at his sides as

4 he walked down from the bathroom towards the living room), 69:17-70:5 (Bui did not point

5 anything at the officers), Schwartz Decl., Ex. O, ECF No. 121-15.  Plaintiffs further say that Bui did

6 not threaten the police with the knife, but instead assumed a defensive, protective, cringing attitude

7 where he turned away from the Officers and bent at the waist, keeping the hand with the knife at his

8 side and bringing the other hand up with an open palm.  Melina H. Depo. at 79:5-82:9 (Bui held

9 knife at his side), Schwartz Decl., Ex. H, ECF No. 121-8; Aaron L. Depo. at 22:3-4 (Bui came out of

10 the bathroom in a self-defense position), 23:21-25:5 (Bui crouched in self-defense position and had

11 one hand open), 39:20-23 (Bui was not aggressive and was in a defense stance), Schwartz Decl., Ex.

12 K, ECF No. 121-11; Simon P. Depo. at 57:19-58:1 (Bui advanced slowly), Schwartz Decl., Ex. M,

13 ECF No. 121-13; Tran Depo. at 21:18-22:19 (Bui's hands were down), 65:21-66:2 (same),

14 69:17-70:5 (Bui never pointed anything at the officers), Schwartz Decl., Ex. O, ECF No. 121-15.

15 The officers ordered that Bui drop the knife, but it appeared that he did not understand them.  Sharon

16 H. Depo. at 69:24-70:2 (Bui did not appear to understand the officers' commands), Schwartz Decl.,

17 Ex. I, ECF No. 121-9; Simon P. Depo. at 46:23-47:3 (same), Schwartz Decl., Ex. M, ECF No. 121-

18 13; Tran Depo. at 20:20-23 (Bui could not hear what the officers were telling him), Schwartz Decl.,

19 Ex. O, ECF No. 121-15; *but see* Sharon H. Depo. at 70:15-71:25 (does not actually know if Bui

20 understood the officers' commands), Schwartz Decl., Ex. I, ECF No. 121-9.  The officers backed up

21 to somewhere in the living room.  UF, Fact 31.  When approximately 6 to 8 feet away from Bui, the

22 officers fatally shot Bui twice, with Officer Ortiz firing two shots (one of which missed Bui), and

23 Officer Wilson firing one.  UF, Fact 33; UF, Fact 34; Herrmann Decl. ¶¶ 3-13, ECF No. 103.  The

24 bullet from Officer Ortiz's gun "passed primarily from [Bui's] left to his right, downward at an

25 angle of approximately 30 degrees and from the front of his body toward the back at an angle of

26 approximately 30 degrees."  Herrmann Decl. ¶ 5, ECF No. 103.  The bullet from Officer Wilson's

27 gun primarily passed through Bui "downward at an angle of approximately 55 degrees" and "was

28 directed from [his] right to left at an angle of approximately 15 degrees and from front to back at an

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    angle of approximately 35 degrees." Herrmann Decl. ¶ 6, ECF No. 103. "The shots were not fired

2    with the officers and [Bui] facing each other in the erect position," Herrmann Decl. ¶ 8, ECF No.

3    103, Bui was turned away to his right from Officer Ortiz, Herrmann Decl. ¶ 10, ECF No. 103, and

4    the bullets may have hit him at a downward angle either because he was shorter than the officers, he

5    was falling from having been shot, or was cringing and trying to avoid being shot, Herrmann Decl.

6    ¶¶ 9-13, ECF No. 103.

7        Defendants present a different story. They say that when Bui emerged from the bathroom, his

8    hands were up near his chest and he walked towards Officers Ortiz and Wilson while waving the

9    X-Acto knife in the air in an aggressive and menacing manner. Ortiz Decl. ¶ 7, ECF No. 82;

10   Whitfield Decl., ¶ 9, ECF No. 83; Wilson Decl., ¶ 8, ECF No. 84; Wilson Depo. at 111:11-112:9,

11   Connolly Decl., Ex. S, ECF No. 93-2. They say that Bui was close enough to Officers Ortiz and

12   Wilson to be able to stab either of them if he lunged towards them. Wilson Decl. ¶ 9, ECF No. 84;

13   Whitfield Decl. ¶ 10, ECF No. 83. Officers Ortiz and Wilson repeatedly told Bui to drop the knife,

14   but he did not do so. UF, Fact 29; Ortiz Decl. ¶¶ 8-9, ECF No. 82; Whitfield Decl. ¶¶ 8, 10, ECF

15   No. 83; Wilson Decl. ¶¶ 9-10, ECF No. 84; Sharon H. Depo. at 43:4-17, 44:4-9, 58:2-4, Connolly

16   Decl., Ex. N, ECF No. 91; Jason W. Depo. at 37:2-15, 40:12-14, 41:18-42:5, 45:2-11, Connolly

17   Decl., Ex. H, ECF No. 88; Marvin C. Depo. at 45:7- 46:2, Connolly Decl., Ex. J, ECF No. 89;

18   Andrew K. Depo. at 34:16-25, Connolly Decl., Ex. C, ECF No. 86-3; Aaron L. Depo. at 19:16-21,

19   22:3-6, 24:7-12, 42:22-43:6, 43:12-44:9, Connolly Decl., Ex. B, ECF No. 86-2; Simon P. Depo. at

20   29:3-7, 57:16-21, Connolly Decl., Ex. O, ECF No. 92. Still holding the knife in the air in an

21   aggressive manner, Bui continued down the hallway (at a regular or quick pace) and toward Officers

22   Ortiz and Wilson, and Officers Ortiz and Wilson continued to order Bui to drop the knife. UF, Fact

23   30; Ortiz Decl. ¶¶ 8-9, ECF No. 82; Wilson Decl., ¶¶ 8-9, ECF No. 84; Tran Depo. at 67:14-25,

24   Connolly Decl., Ex. P, ECF No. 92-1; Sharon H. Depo. at 44:4-17, 56:7-58:4, Connolly Decl., Ex.

25   N, ECF No. 91; Andrew K. Depo. at 34:5-9, 34:16-25, Connolly Decl., Ex. C, ECF No. 86-3; Sandra

26   W. Depo. at 57:14-20, Connolly Decl., Ex. M, ECF No. 90-2; Jason W. Depo. at 39:9-10, 41:1-42:5,

27   47:3-9, Connolly Decl., Ex. H, ECF No. 88; Marvin C. Depo. at 58:5-11, 77:4-8, 90:3-8, Connolly

28   Decl., Ex. J, ECF No. 89; Jonathan Y. Depo. at 47:3-48:4, 48:9-11, 61:8-17, Connolly Decl., Ex. I,

UNITED STATES DISTRICT COURT
For the Northern District of California

C 11-04189 LB
ORDER

9

UNITED STATES DISTRICT COURT
For the Northern District of California

1   ECF No. 88-1.  Facing Bui, the officers, with their guns drawn, walked backwards and side-by-side

2   and retreated into the living room.  Ortiz Decl. ¶ 8, ECF No. 82; Wilson Decl. ¶ 10, ECF No. 84;

3   Andrew K. Depo. at 34:5-9, Connolly Decl., Ex. C, ECF No. 86-3; Marvin C. Depo. at. 47:11-14,

4   Connolly Decl., Ex. J, ECF No. 89.  The officers backed up to somewhere in the living room, UF,

5   Fact 31, and continued to order Bui to drop the knife, Ortiz Decl. ¶ 9, ECF No. 82; Whitfield Decl. ¶

6   10, ECF No. 83; Wilson Decl. ¶ 10, ECF No. 84; Andrew K. Depo. at 35:10-13, Connolly Decl., Ex.

7   C, ECF No. 86-3; Jason W. Depo. at 46:2-11, Connolly Decl., Ex. H, ECF No. 88; Tran Depo. at

8   63:18-20, 66:21-25, Connolly Decl., Ex. P, ECF No. 92-1.  But Bui did not stop.  UF, Fact 32.

9   Instead, Bui continued to advance toward Officers Ortiz and Wilson and threatened them with the

10  knife.  Ortiz Decl. ¶ 9, ECF No. 82; Wilson Decl. ¶¶ 10-11, ECF No. 84; Jason W. Depo. at 42:9-

11  45:11, Connolly Decl., Ex. H, ECF No. 88.  The officers ran out of room to retreat because some of

12  the teens and living room furniture were in the way.  Ortiz Decl. ¶ 9, ECF No. 82; Whitfield Decl. ¶

13  10, ECF No. 83; Wilson Decl. ¶ 11, ECF No. 84; Jason W. Depo. at 42:9-43:3, Connolly Decl., Ex.

14  H, ECF No. 88.  Believing that they and some of the teenagers were at imminent risk of being

15  stabbed or otherwise seriously injured by Bui, the officers shot three times at Bui.  UF, Fact, 33; UF,

16  Fact 35; Ortiz Decl. ¶ 9, ECF No. 82; Wilson Decl. ¶ 11, ECF No. 84; Ortiz Depo at 97:24-99:19,

17  Connolly Decl., Ex. L, ECF No. 90-1; Wilson Depo. at 117:23-118:8, Connolly Decl., Ex. S, ECF

18  No. 93-2.  When they shot, the officers were approximately 4 to 5 feet away from Bui.  Whitfield

19  Decl. ¶ 10, ECF No. 83; Wilson Decl. ¶ 11, ECF No. 84; Jonathan Y. Depo. at 60:24-61:7, Connolly

20  Decl., Ex. I, ECF No. 88-1.  Two of the shots hit the front of Bui's body, fatally injuring him.  UF,

21  Fact 34; Smith Decl. ¶ 10, ECF No. 85.

22      Between 45 and 90 seconds elapsed between the time the officers entered the house and the time

23  shots were fired.  UF, Fact 36.  Approximately 10-15 seconds elapsed from the time the officers first

24  had contact with Bui at the bathroom door to when the shots were fired.  Ortiz Depo. at 109:18-25,

25  Connolly Decl., Ex. L, ECF No. 90-1.  The officers are trained that, when circumstances require the

26  use of their guns, they should aim for the body center mass of the target individual.  Ortiz Decl. ¶ 9,

27  ECF No. 82; Wilson Decl. ¶ 11, ECF No. 84.  Both Officers Ortiz and Wilson attended Peace

28  Officer Standards and Training ("POST") academies.  Corriea Depo. at 71:7-73:1, Schwartz Decl.,

1   Ex. C, ECF No. 121-3; Ortiz Depo. at 14:4-13, 19:19-20:8, Schwartz Decl., Ex. L, ECF No. 121-12;

2   Wilson Depo. at 16:5-17:3, Schwartz Decl., Ex. Q, ECF No. 121-17; *see* Clark Decl. ¶¶ 2(b), 5-9,

3   Exs. C-E, ECF No. 124.

4        While it is undisputed that Officers Ortiz and Wilson told Bui to drop the knife, UF, Fact 29; UF,

5   Fact 30, it is unclear whether they told him that they would shoot him if he did not do so. *Compare*

6   Ortiz Decl. ¶ 8, ECF No. 82 (testifying that he warned he would shoot); Aaron L. Depo. at 22:4-6

7   ("The police pulled their guns on [Bui] and said, 'Drop the weapon or we'll shoot,' or something

8   like that."), 44:2-9 ("'Then the cops warned they would shoot.'"), *with* Wilson Depo. at 71:12-13,

9   71:21-23, 112:20-113:5, 114:22-115:23, Schwartz Decl., Ex. Q, ECF No. 121-17 (no mention of a

10  warning of imminent force); Wilson Decl. ¶10, ECF No. 84 (same); Marvin C. Depo. at 45:12-46:7,

11  77:113-14, Schwartz Decl., Ex. B, ECF No. 121-2 (same); Joanne G. Depo. at 32:21-33:7, Schwartz

12  Decl., Ex. E, ECF No. 121-5 (same); Melina H. Depo. at 87:13-23, Schwartz Decl., Ex. H, ECF No.

13  121-8 (same); Sharon H. Depo. at 43:4-17, 69:19-22, 70:21-23, Schwartz Decl., Ex. I, ECF No. 121-

14  9 (same); Andrew K. Depo. at 34:16-22, 40:20-25, 53:5-9, Schwartz Decl., Ex. J, ECF No. 121-10

15  (same); Simon P. Depo. at 26:13-15, 57:16-18, Schwartz Decl., Ex. M, ECF No. 121-13 (same);

16  Tran Depo. at 21:24-22:1, 66:21-25, Schwartz Decl., Ex. O, ECF No. 121-15 (same); Wilson Depo.

17  at 71:21-23, 112:20-113:5, 114:22-115:2, Schwartz Decl., Ex. Q, ECF No. 121-17 (same); Jason W.

18  Depo. at 37:11-13, 38:16-17, 40:12-14, Schwartz Decl., Ex. R, ECF No. 121-18 (same); Sandra W.

19  Depo. at 56:2-18, 56:23-57:4, Schwartz Decl., Ex. T, ECF No. 121-20 (same).

20  **II. PROCEDURAL HISTORY**

21       Plaintiffs filed their complaint in this court on August 24, 2011.  Complaint, ECF No. 1.  They

22  brought: (1) as successor in interest to Bui's estate and pursuant to 42 U.S.C. § 1983[3], a claim

23  against Officers Ortiz and Wilson for violation of Bui's Fourth Amendment right to be free from

24  excessive force; (2) on their own behalf and pursuant to 42 U.S.C. § 1983, a claim against Officers

25

26       [3] Under California's survival statute, Bui's § 1983 claim survived his death.  *See* Cal. Civ.
27  Proc. Code § 377.20; *Chaudhry v. City of Los Angeles*, --- F.3d ----, 2014 WL 2030195, at *4 (9th
    Cir. May 19, 2014) (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1416-17 (9th Cir. 1987),
28  *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en
    banc)).

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Ortiz and Wilson for interference with their Fourteenth Amendment due process liberty interest in

2   their parental relationship with Bui; (3) as successor in interest to Bui's estate and pursuant to 42

3   U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a claim against

4   CCSF for failure to train; and (4) on their own behalf and pursuant to California Civil Procedure

5   Code § 377.60, a claim against CCSF (under a theory of respondeat superior) for wrongful death[4].

6   *Id.* ¶¶ 29-53.

7       Defendants now move for summary judgment on all four claims.  Motion, ECF No. 81.

8   Plaintiffs oppose the motion, except as to their *Monell* claim.  Opposition, ECF No. 120; *id.* at 9 n.1.

9   Defendants filed a reply.  Reply, ECF No. 110.  The court held a hearing on the matter on June 26,

10  2014.  6/26/2014 Minute Order, ECF No. 136.

**ANALYSIS**

**I. LEGAL STANDARD**

13      The court must grant a motion for summary judgment if the movant shows that there is no

14  genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

15  law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material

16  facts are those that may affect the outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute about

17  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

18  the non-moving party.  *Id.* at 248-49.

19      The party moving for summary judgment bears the initial burden of informing the court of the

20  basis for the motion, and identifying portions of the pleadings, depositions, answers to

21  interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

22  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party

23  must either produce evidence negating an essential element of the nonmoving party's claim or

24  defense or show that the nonmoving party does not have enough evidence of an essential element to

25  carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

26

27          [4] Plaintiffs' Fourteenth Amendment claim is not duplicative of their wrongful death claim
    because prevailing on their Fourteenth Amendment claim entitles them to attorneys' fees, *see* 42
28  U.S.C. § 1988(b), while prevailing on their wrongful death does not.  *See Chaudhry*, 2014 WL
    2030195, at *7.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

*Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. PLAINTIFFS' FOURTH AMENDMENT CLAIMS

Plaintiffs' first claim is against Officers Ortiz and Wilson for violating Bui's Fourth Amendment right to be free from excessive force. Defendants argue that Plaintiffs' claim fails because Officers Ortiz and Wilson used reasonable force and are protected by qualified immunity. As explained below, the court disagrees because genuine issues of material fact prevent the court from deciding whether a Fourth Amendment violation occurred or whether the officers are protected by qualified immunity.

### A. Genuine Issues of Material Fact Prevent the Court from Ruling that Defendants Acted Reasonably as a Matter of Law

42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 639 (1980). Section 1983 is not itself a source for substantive rights, but rather a method for vindicating federal rights conferred elsewhere. *See Graham v. Connor*, 490 U.S. 386, 393–394 (1989). To state

a claim under § 1983, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

It is undisputed that Officers Ortiz and Wilson were acting under color of state law, and Plaintiffs allege that the officers violated Bui's Fourth Amendment right to be free from "unreasonable searches and seizures," U.S. Const. amend. IV, when they "shot [him] without lawful justification."  Complaint, ECF No. 1 ¶ 30.  It is undisputed that Mr. Bui was "seized" within the meaning of the Fourth Amendment.  Thus, the issue before the court is whether the force used during his seizure was "objectively reasonable." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 388).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citations and quotations omitted).  To do so, a court must evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Id*.  The *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829,  837-38 (9th Cir 2013).  Indeed, because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc), courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)

1    (citations omitted).

2        "The reasonableness of a particular use of force must be judged from the perspective of a

3    reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S.

4    at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see id.* at 396-97 ("'Not every push

5    or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the

6    Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  This is

7    because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are

8    often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

9    evolving—about the amount of force that is necessary in a particular situation." *Id.*

10       As the court described above, the two sides have dramatically different accounts of what Bui did

11   and what happened to him.  On one hand, Defendants provide admissible evidence to support their

12   story that Bui came down the hall after the officers and attacked, or at least threatened, them with

13   the knife—the same knife with which Bui had stabbed a teenaged girl moments before.  Defendants

14   also provide admissible evidence showing that the officers responded to the attack by raising their

15   guns, instructing Bui to drop the knife, and retreating until they no longer safely could.  It was only

16   then, when they and some of the teenagers were at imminent risk of being stabbed or otherwise

17   seriously injured, that the officers shot Bui.  If this is in fact what happened, under the applicable

18   authority cited by Defendants, a reasonable jury could find that the officers' actions were

19   reasonable.  *See Plumhoff v. Rickard*, --- U.S. ----, 2014 WL 2178335, at *3, *8 (2014) (the officer

20   acted reasonably in shooting the decedent who posed a grave public safety risk where it was

21   undisputed that the decedent led several officers on a five-minute car chase that exceeded 100 miles

22   per hour, nearly collided with more than 24 other vehicles, actually did collide with a police car,

23   and, after crashing into different police car, reversed and maneuvered onto another street and tried to

24   resume his flight once again); *Wilkinson v. Torres*, 610 F.3d 546, 549, 551 (9th Cir. 2010) (the

25   officer acted reasonably in shooting the decedent where, even construing the facts in the light most

26   favorably to the plaintiffs, the decedent posed an immediate threat to the officer and others because

27   the decedent, driving a van, led the officer on a high-speed and reckless chase, crashed into a

28   telephone pole, ignored the officer's instruction to show his hands and stop the vehicle and instead

accelerated the van while another officer was either lying fallen on the ground or standing but disoriented near the van, and the shooting officer believed the other officer to be at risk of being run over); *Blanford v. Sacramento County*, 406 F.3d 1110, 1112-14, 1117-19 (9th Cir. 2005) (the officers acted reasonably in shooting the plaintiff and had probable cause to believe that the plaintiff posed a threat of serious physical harm to the officers or others where it was undisputed that the plaintiff was walking around a neighborhood while wearing a ski mask, appeared to be breaking into a house, growled or roared loudly while raising a two-and-a-half foot sword, and did not obey the officers' commands to drop it); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1164-65, 1168-70 (9th Cir. 1996) (the officer acted reasonably in shooting the plaintiff where it was undisputed that the erratically-behaving plaintiff, while being arrested, suddenly picked up a knife, ignored the officer's commands to drop it, and then swung it at the officer at close range); *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 693, 695-96 (1st Cir. 1994) (the officer acted reasonably in shooting the plaintiff where it was undisputed that after shouting at the officer "I'll show you" and going into his house, the plaintiff returned holding two steak knives, ignored the officer's warnings to drop them, advanced toward the officer while flailing his arms, and made a kicking or lunging motion toward the officer); *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir. 1991) (the officer acted reasonably in shooting the decedent where it was undisputed that the decedent had previously threatened a victim with a machete, advanced toward the officers and the victim with the machete raised, and ignored the officers warnings to drop it); *Pham v. City of San Jose*, Case No.: 5:11-CV-01526-EJD, 2013 WL 5443027, at *2-3, *7 (N.D. Cal. Sept. 20, 2013) (the officers acted reasonably in shooting the decedent where it was undisputed that the decedent had a knife, had already slit one victim's throat with it, was trying to re-enter the house which contained another potential victim, ignored the officers' instructions to drop the knife, continued to resist arrest even after being tased, and charged at one of the officers); *Deng v. Loeffler*, No. 2:10-CV-00277-PMP-GWF, 2011 WL 2792340, at *1-2 (D. Nev. July 14, 2011) (the officers acted reasonably in shooting the decedent where it was undisputed that the decedent was holding two knives, running at one of the officer with both hands above his head, ignored the officer's instructions to drop the knives, and, after being shot once, appeared as if he was going to lunge after the officer while still holding one of the knives); *Barber v.*

1    *City of Santa Rosa*, No. C-08-5649 MMC, 2010 WL 5069868, at *1-2, *6 (N.D. Cal. Dec. 7, 2010)

2    (the officer acted reasonably in shooting the decedent where it was undisputed that the decedent

3    suffered from schizophrenia, was agitated and armed with a butcher knife, and advanced toward the

4    officer while making verbal threats and raising the knife in an attack position); *MacEachern v. City*

5    *of Manhattan Beach*, 623 F. Supp. 1092, 1095-96, 1103-04 (C.D. Cal. 2009) (holding that the officer

6    acted reasonably in shooting the decedent where the plaintiff did not directly counter the defendants'

7    evidence showing that the decedent matched the description of a suspect who threatened a victim

8    with a knife, was armed with a knife and ignored the officer's instructions to drop it, and jabbed it at

9    the officer while taking steps toward him); *Martinez v. County of Los Angeles*, 47 Cal. App. 4th 334,

10   339-40, 344-46 (Cal. Ct. App. 1996) (the officer acted reasonably in shooting the decedent where it

11   was undisputed that the decedent appeared to be high on PCP and matched the description of a

12   suspect who had brandished a knife, was armed with a carving knife that he held at his waist or with

13   the blade pointed skyward, crossed a busy intersection in complete disregard to oncoming traffic and

14   advanced toward the officer and others, ignored the officer's instruction to stop and drop the knife,

15   and shouted at the officer that he was the one he was looking for and that if the officer did not kill

16   him he would kill the officer).

17       On the other hand, in all of these other cases, it was undisputed that the plaintiff or decedent

18   attacked, or at least threatened the safety of, the officers or others. But in this case, Plaintiffs

19   provide admissible evidence of their own to support their story that Bui, who was much smaller than

20   the two officers, did nothing like that—and it is Plaintiffs' view of the facts that the court must take

21   into account for purposes of Defendants' motion. According to Plaintiffs' evidence, while Bui did

22   have the X-Acto knife in his hand, it was always down at his side, and rather than charging at the

23   officers, he assumed a defensive, cringing posture and shuffled slowly down the hall because the

24   officers told him to come out of the bathroom. They also present evidence that suggests Bui was not

25   directly facing the officers in the erect position and was turned away to his right from Officer Ortiz

26   when he was shot. And if this was what happened, under the applicable authority cited by Plaintiffs,

27   a reasonable jury could find that the officers' actions were not reasonable. *See George*, 736 F.3d at

28   832-33, 838-39 (if a suspect is armed (or reasonably suspected of being armed), a furtive movement,

1   harrowing gesture, or serious verbal threat might create an immediate threat, but the mere fact that a

2   suspect is armed with a deadly weapon does not render an officer's shooting of the suspect per se

3   reasonable under the Fourth Amendment; if the officers "indeed shot the sixty-four-year-old

4   decedent without objective provocation while he used his walker, with gun trained on the ground,

5   then a reasonable jury could determine that they violated the Fourth Amendment"); *Glenn*, 673 F.3d

6   at 867-69, 872-78 (while a suspect's possession of a knife is an important consideration, it is not

7   dispositive on its own; finding that a jury could find that the officers' decision to shoot an individual

8   holding a pocket knife, which the individual did not brandish at anyone, violated the Constitution);

9   *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill

10  suspects who do not pose an immediate threat to their safety or to the safety of others simply

11  because they are armed."); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991)

12  (holding that deadly force was unreasonable where, according to the plaintiff's version of facts, the

13  decedent possessed a gun but was not pointing it at the officers and was not facing the officers when

14  they shot him).

15      At the July 26, 2014 hearing, Defendants argued that it is immaterial whether Bui had the knife

16  down at his side, because he nevertheless was "advancing" toward the officers, did not drop the

17  knife, and had already stabbed someone, but the court does not agree that, under the authority cited

18  above, this is true as a matter of law.  The Ninth Circuit has made clear that "there are no per se

19  rules in the Fourth Amendment excessive force context," *Mattos*, 661 F.3d at 441, and that court

20  must "examine the totality of the circumstances, *Bryan*, 630 F.3d at 826.  Here, the court believes

21  that it matters whether Bui had the knife pointed toward the officers or down at his side, was

22  walking normally or shuffling, was "advancing" down the hallway at a normal pace or extremely

23  slowly, and was directly facing the officers when shot or was in a cringing, defensive position.

24  After drawing all inferences from the underlying facts in the light most favorable to Plaintiffs, a

25  reasonable jury could conclude that the officers acted unreasonably.  The court disagrees that the

26  case law establishes as a matter of law that the officers acted reasonably.

27      Plaintiffs also point to disputed facts relating to other factors bearing upon the court's inquiry.

28  One factor is whether the officers knew or should have known that Bui had mental health problems.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   *See Glenn*, 673 F.3d at 875-76 (reversing the district court's grant of summary judgment in part

2   because the decedent, who was threatening only himself, obviously was emotionally disturbed and

3   the officers should have assigned greater weight to this fact) (citing *Deorle v. Rutherford*, 272 F.3d

4   1272, 1283 (9th Cir. 2001) (while explicitly not adopting a per se rule establishing two different

5   classifications for mentally disabled persons and serious criminals, still emphasizing that "where it is

6   or should be apparent to the officers that the individual involved is emotionally disturbed," this is a

7   factor to be considered in determining the reasonableness of the force employed)); *Burns v. City of*

8   *Redwood City*, 737 F. Supp. 2d 1047, 1059-60 (N.D. Cal. 2010) (denying the defendants' summary

9   judgment motion in part because of disputed facts surrounding the officers' awareness of the

10  plaintiff's mental health condition, which "has a role to play in the reasonableness inquiry").

11  Another is whether the officers (who told Bui to drop the knife) also told him that they would shoot

12  him if he did not drop the knife and whether Bui heard or understood the warnings that they gave

13  him.[5] *See Glenn*, 673 F.3d at 876 (reversing the district court's grant of summary judgment in part

14  because it was not clear whether the decedent heard or understood the officers' warnings and the

15  decedent may have been confused about whether his life was in immediate danger) (citing *Deorle*,

16  272 F.3d at 1284 (instructing that "warnings should be given, when feasible, if the use of force may

17  result in serious injury, and that the giving of a warning of the failure to do so is a factor to be

18  considered in applying the *Graham* balancing test")).

19      In sum, the parties dispute facts that bear directly on whether a reasonable officer could have

20  viewed Bui as an immediate threat to the officers or others (including whether he was shuffling,

21  cringing, defensive, and had his hand down or whether he instead was aggressive and menacing).

22  Resolution of these different accounts of how Bui was acting involves credibility determinations.

23  Resolution of the disputed material facts is a job for the jury, and there is sufficient evidence for a

24  reasonable jury to return a verdict for either party.  Moreover, after drawing all inferences from the

25  underlying facts in the light most favorable to Plaintiffs for purposes of Defendants' motion, and

27      [5] Defendants correctly point out that warnings are required "when feasible," but this further
28  demonstrates the inappropriateness for deciding this issue on summary judgment: given the disputes
    about what happened, the court cannot decide whether it was feasible for give Bui more detailed
    warnings that they say they did.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

considering all the authority cited by Defendants, the court cannot say, as a matter of law, that the officers acted reasonably in shooting Bui.  The court thus denies Defendants' motion insofar as it asks the court conclude that the officers did not violate Bui's Fourth Amendment right to be free from excessive force.[6]  *See George*, 736 F.3d at 838-39 (affirming the district court's denial of the defendants' motion for summary judgment because it could not say the officers assuredly stayed within Constitutional bounds without knowing "[w]hat happened at the rear of [the plaintiff's] residence during the time [the plaintiff] walked out into the open on his patio and the fatal shot [was fired]"); *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) ("In this

---

[6] Plaintiffs contend that they also bring a Fourth Amendment claim based on the Officers Ortiz's and Wilson's "provocation" of the confrontation that led to Bui being shot.  *See* Opposition, ECF No. 27-31.  As the Ninth Circuit has explained, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be liable for his otherwise defensive use of deadly force."  *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); *see Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994).  In that circumstance, however, the "basis for liability for the subsequent [defensive] use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonableness standard."  *Id.* at 1190.  Plaintiffs argue in their opposition that Officers Ortiz and Wilson recklessly and intentionally provoked the confrontation because they subsequently testified that they would not have done anything differently had they known that Bui was mentally ill and that the officers' allegedly unlawful entry into the house and pointing of their guns at the allegedly non-threatening Bui constitute independent Fourth Amendment violations.  *See* Opposition, ECF No. 120 at 29-31.  Defendants, in turn, argue in their reply that the officers did not commit independent Fourth Amendment violations and, nevertheless, Plaintiffs cannot introduce this new theory of liability this late in the case.  *See* Reply, ECF No. 110 at 13-20.

The court declines hold that Defendants are entitled to summary judgment with respect to a Fourth Amendment provocation theory.  First, Defendants say that they would have conducted more detailed discovery regarding the alleged independent Fourth Amendment violations had it been clear that Plaintiffs brought a provocation theory claim, and the court is not convinced there has been sufficient briefing on the matter.  Second, the concept of escalation is raised in the Complaint, *see* Complaint, ECF No. 1, ¶ 20, and the context of what happened is relevant to whether the officers acted reasonably.  The case is charged as an excessive-force-resulting-in-wrongful-death case because that is what the harm is.  That a stand-alone provocation theory claim is not explicitly alleged in the complaint does not preclude the court from considering the entire context of what happened (from entry to shooting) when determining whether the officers' subsequent conduct was reasonable.  The court expressed this opinion at the June 26, 2014 hearing, and neither party took issue with it.  Third, pleadings often are amended to conform to the proof, even at trial, and to the extent that there are disputes, they seem better addressed by motions in limine or jury instructions.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  case, the district court properly denied the summary judgment motion because there are genuine

2  issues of fact regarding whether the officers violated [the decedent's] Fourth Amendment rights.").

3  Indeed, as the Ninth Circuit explained when confronted with similar circumstances:

> Balancing these various considerations, we hold that the district court erred in granting summary judgment on the constitutionality of the officers' use of force. We recognize that the officers have offered evidence that could support a verdict in their favor. A jury could view the facts as the district court did, and likewise reach the conclusion that the officers' use of force was reasonable. But on summary judgment, the district court is not permitted to act as a factfinder. The circumstances of this case can be viewed in various ways, and a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence. Because the disputed facts and inferences could support a verdict for either party, we are compelled to reverse the district court's entry of summary judgment.

10  *Glenn*, 673 F.3d at 878 (internal citation omitted); *see also Burns*, 737 F. Supp. 2d at 1058-59

11  ("Because an excessive force claim 'nearly always requires a jury to sift through disputed factual

12  contentions, and to draw inferences therefrom,' the Ninth Circuit has also instructed that summary

13  judgment in excessive force cases should be granted sparingly.") (citing *Santos v. Gates*, 287 F.3d

14  846, 853 (9th Cir. 2002)).

15  **B. The Officers Are Not Entitled to Qualified Immunity at This Time**

16  Defendants assert that even if Officers Ortiz and Wilson violated Bui's Fourth Amendment right

17  by using excessive force, they are entitled to qualified immunity because as of 2010 case law was

18  clear that officers may lawfully use deadly force when a suspect threatens and assaults the officer

19  with a knife. *See* Motion, ECF No. 81 at 22-25.

20  "The doctrine of qualified immunity protects government officials 'from liability for civil

21  damages insofar as their conduct does not violate clearly established statutory or constitutional

22  rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

23  (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances

24  two important interests—the need to hold public officials accountable when they exercise power

25  irresponsibly and the need to shield officials from harassment, distraction, and liability when they

26  perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of

27  whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on

28  mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)

1   (Kennedy, J., dissenting)).

2   In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for

3   resolving government officials' qualified immunity claims." *Id.* at 232. "First, a court must decide

4   whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see

5   Rules 50, 56) make out a violation of a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201).

6   This part of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels

7   v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated

8   were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533

9   U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the

10  right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555

11  U.S. at 232. "Qualified immunity is applicable unless the official's conduct violated a clearly

12  established constitutional right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).[7]

13  As to step one, as noted above, genuine issues of material fact exist regarding whether the

14  officers used objectively reasonable force in shooting Bui.

15  As to step two, "the relevant, dispositive inquiry in determining whether a right is clearly

16  established is whether it would be clear to a reasonable officer that his conduct was unlawful in the

17  situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978

18  (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as

19  a broad general proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is

20  protected by qualified immunity unless the very action in question has previously been held

21  unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

22  *Anderson*, 483 U.S. at 640.

23  Defendants argue that as of 2010, the year the officers shot Bui, "it was well-established that

24  _____

25      [7] The Supreme Court has stated that the order in which these questions are addressed is left
    to the lower court's discretion. *Pearson*, 555 U.S. at 236 ("[W]hile the sequence set forth [in
26  *Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the
    district courts and the courts of appeals should be permitted to exercise their sound discretion in
27  deciding which of the two prongs of the qualified immunity analysis should be addressed first in
    light of the circumstances in the particular case at hand."). That said, the Supreme Court also
28  believes that the order used in *Saucier* "is often beneficial." *Id.*

'where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.'"  Motion, ECF No. 81 at 22-23 (quoting *Billington v. Smith*, 292 F.3d 1177, 1181 (9th Cir. 2002) and citing *Gregory v. County of Maui*, 523 F.3d 1103, 1108 (9th Cir. 2008); *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007); *Blanford*, 406 F.3d at 1117-18; *Reynolds*, 84 F.3d at 1168).  They also argue that as of 2010 it was well-established that "deadly force is proper when a mentally disturbed suspect threatens and assaults officers with a knife."  *Id.* at 23 (citing *Reynolds*, 84 F.3d at 1168).  But as described above, under Plaintiffs' version of the facts, Bui did not attack or threaten Officers Ortiz or Wilson or anyone else in the house after he left the bathroom and before the officers shot him.  Again, according to Plaintiffs' evidence, while Bui did have the X-Acto knife in his hand, it was always down at his side, and rather than charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the hall because the officers told him to come out of the bathroom.  They also present evidence that suggests Bui was not directly facing the officers in the erect position and was turned away to his right from Officer Ortiz when he was shot.

Officers Ortiz and Wilson shot Bui in 2010, and by that time "[c]ase law ha[d] clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others."  *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010); *see Curnow*, 952 F.2d at 325 (affirming the district court's denial of qualified immunity for officers where, under the plaintiff's version of the 1986 shooting, the officers could not reasonably have believed the use of deadly force was lawful because the decedent did not point the gun at the officers and apparently was not facing them when they shot him the first time).  It is not enough to simply say, as Defendants do in arguing for qualified immunity, that Bui posed an immediate threat to the officer or others because he previously harmed Sharon H., "advanced" toward the officers while holding a knife, and did not drop it: how Bui moved and the speed at which he moved as he "advanced" toward the officers matters, and the court does not believe that, under Plaintiffs' version of the facts, Bui's slow, cringed, defensive shuffling while holding an X-Acto knife at his side constituted an immediate threat to the officers or others.  The court does not believe that the case law cited by Defendants supports such a finding.  And if Bui did not present an immediate threat to the

UNITED STATES DISTRICT COURT
For the Northern District of California

1  officers or others, they were not allowed to use deadly force to apprehend him, and qualified

2  immunity does not apply to their actions.  *See Wilkinson*, 610 F.3d at 550; *Curnow*, 952 F.2d at 325.

3      This is not to say that the officers may not be entitled to qualified immunity after the disputed

4  material facts are resolved.  But for now, the court denies Defendants' motion insofar as it asks the

5  court conclude that the officers are entitled to qualified immunity.  *See Wilkins v. City of Oakland*,

6  350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends

7  on the resolution of disputed issues of fact in their favor, and against the non-moving party,

8  summary judgment is not appropriate."); *Santos*, 287 F.3d at 855 n.12 (finding it premature to

9  decide the qualified immunity issue "because whether the officers may be said to have made a

10  'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the

11  inferences it draws therefrom") (internal citation omitted); *McCloskey v. Courtnier*, No. C 05-4641

12  MMC, 2012 WL 646219, at *3 (N.D. Cal. Feb. 28, 2012); *Burns*, 2010 WL 3340552, at *12 ("Just

13  as the question of whether a constitutional violation occurred here turns entirely on whose facts to

14  accept, so too does the question of immunity.  More simply, if [plaintiff] behaved as the officers

15  contend, their mistake of fact might be objectively reasonable.  If he did not, the mistake may be

16  deemed unreasonable."); *Herrera v. Las Vegas Metro. Police Dept.*, 298 F. Supp. 2d 1043, 1051 (D.

17  Nev. 2004) ("[I]t would be premature to determine the officials' qualified immunity status at this

18  time [after having concluded that a reasonable jury could find that the action complained of

19  constituted a violation of the decedent's Constitutional rights], because whether the officers may be

20  said to have acted reasonably will depend on the jury's resolution of the disputed facts.") (citation

21  omitted).

22  **III.  PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM**

23      Plaintiffs' second claim is that Defendants' use of force unconstitutionally interfered with their

24  rights to familial relationships in violation of the Fourteenth Amendment.  Defendants argue that

25  their claim fails because Officers Ortiz's and Wilson's conduct did not "shock the conscience" and

26  are protected by qualified immunity.  As explained below, the court disagrees because genuine

27  issues of material fact prevent the court from deciding whether a Fourteenth Amendment violation

28  occurred or whether the officers are protected by qualified immunity

UNITED STATES DISTRICT COURT
For the Northern District of California

1

**A.  Genuine Issues of Material Fact Prevent the Court from Deciding Whether a**

2

**Fourteenth Amendment Violation Occurred**

3

The Fourteenth Amendment's substantive due process clause protects against the arbitrary or

4

oppressive exercise of government power.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-

5

46 (1998).  Parents and children may assert Fourteenth Amendment substantive due process claims

6

if they are deprived of their liberty interest in the companionship and society of their child or parent

7

through official conduct.  *See Lemire v. Cal. Dept. of Corrections & Rehabilitation*, 726 F.3d 1062,

8

1075 (9th Cir. 2013) (parents and children); *Smith v. City of Fontana*, 818 F.2d at 1418-19; *Curnow*

9

*v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (parent); *Crumpton v. Gates*, 947 F.2d 1418,

10

1421-24 (9th Cir. 1991) (child); *cf. Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992)

11

(sibling has no constitutionally protected interest in brother's companionship under section 1983).

12

"[T]he Due Process Clause is violated by executive action only when it can be properly

13

characterized as arbitrary, or conscience shocking, in a constitutional sense."  *County of Sacramento*

14

*v. Lewis*, 523 U.S. at 845-47; *see Lemire*, 726 F.3d at 1075.  The cognizable level of executive abuse

15

of power is that which "shocks the conscience" or "violates the decencies of civilized conduct."  *Id.*

16

at 846.  Mere negligence or liability grounded in tort does not meet the standard for a substantive

17

due process decision.  *Id.* at 849.

18

"In determining whether excessive force shocks the conscience, the court must first ask 'whether

19

the circumstances are such that actual deliberation [by the officer] is practical.'"  *Porter v. Osborn*,

20

546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d

21

365, 372 (9th Cir. 1998) (internal quotation marks omitted)).  "Where actual deliberation is

22

practical, then an officer's 'deliberate indifference' may suffice to shock the conscience.  On the

23

other hand, where a law enforcement officer makes a snap judgment because of an escalating

24

situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm

25

unrelated to legitimate law enforcement objectives."  *Hayes v. County of San Diego*, 736 F.3d 1223,

26

1230 (9th Cir. 2013) (citing *Wilkinson*, 610 F.3d at 554).[8]

27

_____

28

[8] In their motion, Defendants appear to assume that the "purpose to harm" standard applies
and contend that a plaintiff must present evidence that the officer acted with "malice" to prevail on a

UNITED STATES DISTRICT COURT
For the Northern District of California

1    A court may determine at summary judgment whether the officer had time to deliberate (such

2  that the deliberate indifference standard applies) or instead had to make a snap judgment because he

3  found himself in a quickly escalating situation (such that the purpose to harm standard applies), "so

4  long as the undisputed facts point to one standard or the other." *Duenez v. City of Manteca*, No.

5  CIV. S-11-1820 LKK/KJN, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013).  But, "[b]y its

6  nature, the determination of which situation [the officer] actually found himself in is a question of

7  fact for the jury, so long as there is sufficient evidence to support both standards." *Id.*

8    In their motion, although they never make it explicit, Defendants argue that the purpose to harm

9  standard applies because Officers Ortiz and Wilson did not have time to deliberate before having to

10  shoot Bui because the situation in the house was quickly escalating and he attacked or threatened

11  them with the knife.  *See* Motion, ECF No. 81 at 26-27.  Assuming that this standard applies,

12  Defendants then argue that they are entitled to summary judgment because Plaintiffs do not (and

13  cannot) point to admissible evidence showing that Officers Ortiz or Wilson acted with a purpose to

14  ─────────────────────────

15  14th Amendment due process claim.  *See* Motion, ECF No. 81 at 26-27.  Defendants then argue that
Plaintiffs here have not done so.  *Id.*  Defendants disagree that "malice" is included in the "purpose
16  to harm" standard.  Opposition, ECF No. 120 at 31-32.  While it true that the Supreme Court stated
in *Whitley v. Albers*, 475 U.S. 312 (1986), that the standard for claims under the Eighth Amendment
17  turns on "'whether force was applied in a good faith effort to maintain or restore discipline or
maliciously and sadistically for the very purpose of causing harm,'" *id.* at 320-21 (quoting Johnson
18  v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)), and while it also is true that in *Lewis* the Supreme
Court analogized to the prison riot context at issue in *Whitley* when it held that the "purpose to
19  harm" standard applied to judge an officer's decisions while in a high-speed pursuit of a suspect on a
motorcycle, *see* 523 U.S. at 852-53, the Supreme Court nevertheless omitted any "malicious" and
20  "sadistic" language when it explicitly held that "only a purpose to cause harm unrelated to the
legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience"
21  that is necessary for a due process violation in the context of a high-speed automobile chase, *id.* at
836.  Subsequent Ninth Circuit opinions also have failed to include any "malicious" and "sadistic"
22  language when stating the "purpose to harm" standard.  *See Porter*, 546 F.3d at 1137, 1140 (citing
*Lewis*, 523 U.S. at 836); *see also Wilkinson*, 610 F.3d at 554 (citing *Porter*, 546 F.3d at 1140).
23  Following the Supreme Court's explicit holding in Lewis and the subsequent Ninth Circuit opinions,
the court finds that Plaintiffs need not present evidence that Officers Ortiz and Wilson acted with
24  "malice" to prevail on their 14th Amendment due process claim.  *See Rodriguez v. City of Fresno*,
819 F. Supp. 2d at 937, 948 (E.D. Cal. 2011) ("In this circuit, the phrase 'maliciously and
25  sadistically for the very purpose of causing harm' is often restated as requiring that the plaintiff
show that the officer 'acted with a purpose to harm [the plaintiff] for reasons unrelated to legitimate
26  law enforcement objectives.'") (quoting *Porter*, 546 F.3d at 1137)).

UNITED STATES DISTRICT COURT
For the Northern District of California

1   harm Bui.  Rather, the officers acted in furtherance of a legitimate law enforcement objective, and

2   they were forced to shoot Bui "in response to the life-threatening circumstances they faced."

3   Motion, ECF No. 81 at 27.

4       Even though the officers were not in the house for very long—it is undisputed that between 45

5   and 90 seconds elapsed between the time the officers entered the house and the time shots were

6   fired, and approximately 10 to 15 seconds elapsed from the time the officers first had contact with

7   Bui at the bathroom door to when the shots were fired—Plaintiffs argue that it is not clear whether

8   Officers Ortiz and Wilson in fact were in a quickly escalating situation that required them to make

9   the snap judgment to shoot Bui because, as the court described above, there is evidence showing that

10  while Bui did have the X-Acto knife in his hand, it was always down at his side, and rather than

11  charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the hall

12  because the officers told him to come out of the bathroom.  They also present evidence that suggests

13  Bui was not directly facing the officers when he was shot.  Viewing the evidence in favor of

14  Plaintiffs, it is possible that the deliberate indifference, and not the purpose to harm, standard would

15  apply here.  *See Duenez*, 2013 WL 6816375, at *15 ("Even if it found that decedent had a knife in

16  his hand, that alone would not necessarily bring the situation into a 'purpose to harm' situation,

17  since a reasonable jury could find that decedent was not advancing on [the officer], nor threatening

18  him with the knife.").  Plaintiffs go on to point out that courts have denied summary judgment when

19  it was unclear, because of the disputed facts, which standard applied.  *See id.* (finding that there was

20  "a genuine dispute about whether [the officer] had the 'luxury' of deliberation" and denying

21  summary judgment in favor of the defendants on the plaintiffs' Fourteenth Amendment due process

22  claim because "a reasonable jury could find [that the officer] acted with deliberate indifference in a

23  non-emergency situation, or that he acted with a purpose to harm decedent"); *McCloskey*, 2012 WL

24  646219, at *4 (denying summary judgment in favor of the officer on the plaintiffs' Fourteenth

25  Amendment due process claim because "the facts relevant to a determination of whether [the officer]

26  had time to fully consider his use of pepper spray and/or whether he acted with 'deliberate

27  indifference'" are disputed); *F.C. ex rel. Rios v. County of Los Angeles*, No. CV 10-169 CAS (Rzx),

28  2010 WL 5157339, at *5-6 (C.D. Cal. Dec. 13, 2010) (denying summary judgment in favor of the

1   defendants on the plaintiffs' Fourteenth Amendment due process claim where the facts regarding

2   how the shooting occurred were disputed).

3        The court notes that Defendants failed to respond in their reply to any of Plaintiffs' arguments

4   about the Fourteenth Amendment claim.  *See generally* Reply, ECF No. 110.  Based on the record

5   and the authorities cited, the court denies Defendants' motion insofar as it asks the court conclude

6   that the officers did not violate Plaintiffs' Fourteenth Amendment due process right to be free from

7   interference with their rights to familial relationships.

8        **B.  The Court Cannot Say at this Time that the Officers are Entitled to Qualified Immunity**

9        Defendants assert that even if Officers Ortiz and Wilson violated Plaintiffs' Fourteenth

10  Amendment rights by using excessive force that shocks the conscience, they are entitled to qualified

11  immunity.  But just as their qualified immunity argument fails with respect to Plaintiffs' Fourth

12  Amendment claim, their arguments fails with respect to Plaintiffs' Fourteenth Amendment claim,

13  too.  This is because, based on the evidence presented by both sides, it is unclear what the situation

14  was, and thus the court cannot decide as a matter of law whether it would have been "clear to a

15  reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S.

16  at 202.  In these circumstances, the court denies Defendants' motion insofar as it asks the court

17  conclude that the officers are entitled to qualified immunity.

18  **IV.  PLAINTIFFS' *MONELL* CLAIM**

19       Plaintiffs' third claim is against CCSF for its failure to train the officers.  In their opposition,

20  Plaintiffs state that they do not oppose Defendants' motion for summary judgment with respect to

21  Plaintiffs' third claim.  Opposition, ECF No. 120 at 9 n.1.  Accordingly, the court grants Defendants'

22  motion with respect to Plaintiffs' third claim.

23  **V.  PLAINTIFFS' WRONGFUL DEATH CLAIM**

24       Plaintiffs' fourth claim is against CCSF (under a theory of respondeat superior) for wrongful

25  death, *see* Cal. Civ. Proc. Code § 377.60, which is simply the statutorily-created right of an heir to

26  recover damages resulting from a tortious act which results in the decedent's death," *Gilmore v.*

27  *Superior Court*, 230 Cal. App. 3d 416, 420 (Cal. Ct. App. 1991) (citations omitted).  "The elements

28  of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting

UNITED STATES DISTRICT COURT
For the Northern District of California

1    death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh*

2    *Ave. Center*, 140 Cal. App. 4th 1256, 1264 (Cal. Ct. App. 2006).  The California Supreme Court has

3    held that "an officer's lack of due care can give rise to negligence liability for the intentional

4    shooting death of a suspect." *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979) (citing *Grudt v. City of Los*

5    *Angeles*, 2 Cal. 3d 575, 587 (1970)).  In this context, to prove the tort, a plaintiff must show that the

6    officer violated his "duty to use reasonable force under the totality of the circumstances."  *See*

7    *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526 n.10 (Cal. Ct. App. 2009).  Moreover, where the

8    officer's preshooting conduct did not cause the plaintiff any injury independent of the injury

9    resulting from the shooting, the officer's preshooting conduct is properly "included in the totality of

10   circumstances surrounding [his] use of deadly force." *Hayes v. County of San Diego* ("*Hayes I*"), 57

11   Cal. 4th 622, 632 (2013).

12       Defendants argue that CCSF is not liable because the officers are protected by several statutory

13   privileges and thus are immune from liability.  *See Gilmore*, 230 Cal. App. 3d at 421 ("A privileged

14   act is by definition one for which the actor is absolved of any tort liability, whether premised on the

15   theory of negligence or of intent.") (citations omitted).

16       First, they argue that they are protected under California Penal Code § 835a, which provides that

17       [a]ny peace officer who has reasonable cause to believe that the person to be arrested
         has committed a public offense may use reasonable force to effect the arrest, to
18       prevent escape, or to overcome resistance."  It goes on to provide in pertinent part
         that "[a] peace officer who makes or attempts to make an arrest need not retreat or
19       desist from his efforts by reason of the resistance or threatened resistance of the
         person being arrested.

20

21       As to Officers Ortiz's and Wilson's shooting of Bui, Defendants argue that the "reasonableness"

22   standard for a wrongful death claim is the same as the standard for a Fourth Amendment excessive

23   force claim and that Plaintiffs' wrongful death claim fails because Plaintiffs' Fourth Amendment

24   excessive force claim fails.  But as explained above, there are genuine issues of material fact that

25   prevent the court from ruling that the officers' conduct did not violate the Fourth Amendment, and

26   this means that the court also cannot rule that the officers were not liable for wrongful death.

27   Defendants' reliance on *Hernandez v. City of Pomona* does not change this outcome because in that

28   case the officers' conduct was determined to be reasonable under the Fourth Amendment.  *See* 46

UNITED STATES DISTRICT COURT
For the Northern District of California

Cal. 4th 501, 512, 516 (2009) (plaintiffs were collaterally estopped from bringing a wrongful death claim based on the officers' use of deadly force because a federal court previously ruled that the officers' conduct (shooting the decedent) was reasonable under the Fourth Amendment). Here, there has been no such ruling, and the court will not make such a ruling on summary judgment.

As to Officers Ortiz's and Wilson's preshooting conduct, Defendant argue that the officers were entitled to persist in arresting Bui, in the face of his resistance. They again cite *Hernandez*, which rejected the plaintiffs' "preshooting negligence claim" because the officers had probable cause to arrest the decedent and, under Section 835a, could use reasonable force to arrest him and did not have an obligation to stop trying to do so. *See id.* at 518-21. But in that case, the court's decision was made "in light of the [federal court's previous] finding that the shooting was reasonable," so the court focused only on the officers' pre-shooting pursuit of the decedent. *See id.* Here, on the other hand, Plaintiffs' wrongful death claim is not limited only to the officers' preshooting conduct; instead, it is based on the totality of the circumstances surrounding his death, and it is still undecided whether the officers' shooting of Bui was reasonable. Thus, the officers' preshooting conduct should not be considered separately from their shooting of Bui. *See Hayes I*, 57 Cal. 4th at 632 (where the officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's preshooting conduct is properly "included in the totality of circumstances surrounding [his] use of deadly force"). Accordingly, the court cannot find that the officers are protected under Section 853a in these circumstances.

Second, Defendants argue that they are protected under California Penal Code § 196. "Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty." *Brown*, 171 Cal. App. 4th at 533 (internal quotation marks omitted). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Id.* (internal quotation marks omitted) (alteration in original). The obvious problem with this argument is that the court cannot say at this stage whether Officers Ortiz's and Wilson's actions were reasonable because there are genuine issues of material fact

UNITED STATES DISTRICT COURT
For the Northern District of California

regarding what happened, and under Plaintiffs' version of the facts, a reasonable jury could conclude that the officers' actions were not reasonable.  Plaintiffs cite several opinions where courts have rejected Section 196 immunity arguments in this situation, *see Mitchell v. City of Pittsburg*, No. C 09-00794 SI, 2013 WL 5487816, at *12 (N.D. Cal. Oct. 1, 2013) (rejecting on summary judgment the defendants' Section 196 immunity argument where a reasonable jury could find that the officer used excessive force in shooting the decedent); *McMurray v. County of Sacramento*, No. CIV S-09-2245 GEB, 2011 WL 4709876, at *28 (Oct. 4, 2011) (rejecting on summary judgment the defendants' Section 196 immunity argument because "there are genuine issue[s] of material fact regarding whether [the officer's] use of deadly force was reasonable, and whether the circumstances surrounding the incident reasonably created a fear in [the officer] of great bodily injury or death to himself or others"); *Adams v. Speers*, No. CV-F-02-5741 LJO, 2004 WL 5567292, at *15 (Dec. 16, 2004) (rejecting on summary judgment the defendants' Section 196 immunity argument where the plaintiffs "raised factual issues [about] whether [the officer] was in danger when he fired six shots," "whether [the officer] acted reasonably," and "whether the circumstances generated a reasonable fear of danger to [the officer] or others"; "Since this Court is not prepared to rule that [the officer's] conduct does not shock the conscience, this Court is not prepared to rule he justifiably killed [the decedent] under California Penal Code sections or was otherwise immune."); *cf. Martinez*, 47 Cal. App. 4th at 349-50 (because the court concluded that the officers acted reasonably under a 42 U.S.C. § 1983 excessive force claim analysis, the court also concluded that the plaintiffs' wrongful death claims were barred under Section 196), and Defendants failed to address any of them in their reply, *see generally* Reply, ECF No. 110.  This court likewise declines to find that the officers are protected under Section 196 in these circumstances.

Third, Defendants argue that they are protected by California Government Code § 821.6, which provides that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  As the Ninth Circuit has explained, "[t]he provision's principal function is to provide relief from malicious prosecution," *Blankenhorn v. City of Orange*, 485 F.3d 463, 487-88 (9th Cir. 2007) (citing *Kayfetz v. California*, 156 Cal. App. 3d 491, 497 (Cal.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Ct. App. 1984)), but it "also 'extends to actions taken in preparation for formal proceedings,'

2   including actions 'incidental to the investigation of crimes,'" *id.* at 488 (citing *Amylou R. v. County

3   of Riverside*, 28 Cal. App. 4th 1205, 1209-11 (Cal. Ct. App. 1994)).   "Even so, section 821.6, as it

4   applies to police conduct, is limited to actions taken in the course or as a consequence of an

5   investigation."   *Id.*   With this in mind, Plaintiffs point out that the problem with Defendants'

6   argument is that the officers' shooting of Bui is "not the sort of conduct to which section 821.6

7   immunity has been held to apply."   *See id.* (citing *Crowe v. County of San Diego*, 303 F. Supp. 2d

8   1050, 1120 (S.D. Cal. 2004), *rev'd in part on other grounds*, 608 F.3d 406 (9th Cir. 2010) (applying

9   Section 821.6 immunity to officers who conducted interrogations and strip searches during the

10  course of a murder investigation); *Baughman v. California*, 38 Cal. App. 4th 182, 191-93 (1995)

11  (applying Section 821.6 immunity to officers who destroyed computer floppy disks during a search

12  related to an investigation of computer equipment theft); *Amylou R.*, 28 Cal. App. 4th at 1210-11

13  (applying Section 821.6 immunity to officers who took a rape and attempted murder victim against

14  her will to the crime scene and later told neighbors that she was lying about what happened)).

15  Rather, in this case, "the alleged tortious conduct occurred during an arrest, not an investigation."

16  *See id.* (rejecting the defendants' Section 821.6 argument because the plaintiff's assault and battery,

17  negligence, and intentional infliction of emotional distress claims are based on acts that allegedly

18  happened during his arrest, not pursuant to an investigation into his guilt); *Tien Van Nguyen v. City

19  of Union City*, No. C-13-01753-DMR, 2013 WL 3014136, at *7 (N.D. Cal. June 17, 2013) (rejecting

20  the defendants' Section 821.6 argument because the plaintiffs' intentional infliction of emotional

21  distress claim was based on the defendant officers' use of excessive force against him during his

22  arrest); *Medora v. City and County of San Francisco*, No. C 06-0558 EDL, 2007 WL 2522319, at

23  *10 (N.D. Cal. Aug. 31, 2007) (rejecting the defendants' Section 821.6 argument because "there is

24  no evidence that the officers at the scene of the excessive force incident were engaged in the

25  investigation of a crime for purposes of immunity under this section").   Defendants' attempt to

26  distinguish *Blankenhorn* on the ground that the officers' "decision to seek out and confront Bui

27  immediately, without resorting to other tactics," was "investigative in nature," Motion, ECF No. 81

28  at 35 n.14, is not persuasive in light of the authorities cited by Plaintiffs (and which were not

UNITED STATES DISTRICT COURT
For the Northern District of California

addressed by Defendants in their reply, *see generally* Reply, ECF No. 110).  Accordingly, the court finds that Section 821.6 immunity does not protect Officers Ortiz and Wilson from liability for Plaintiffs' wrongful death claim.

In sum, the court finds that it cannot yet determine whether the officers are protected by California Penal Code §§ 835a or 196 and that California Government Code § 821.6 does not apply here.  Accordingly, the court denies Defendants' motion insofar as it asks the court conclude that they are entitled to summary judgment on Plaintiffs' fourth claim.

## CONCLUSION

Based on the foregoing, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  The court **DENIES** the motion with respect to Plaintiffs' first claim for a violation of the Fourth Amendment, Plaintiffs' second claim for a violation of the Fourteenth Amendment, and Plaintiffs' fourth claim for wrongful death.  The court **GRANTS** the motion with respect to Plaintiffs' third claim under *Monell*.

**IT IS SO ORDERED.**

Dated: July 25, 2014

_____
LAUREL BEELER
United States Magistrate Judge