UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| CHIEN VAN BUI,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>        Defendants. | Case No. 11-cv-04189-LB<br><br>**ORDER REGARDING PLAINTIFFS' MOTION TO STRIKE DR. LAUFER'S TESTIMONY AND DEFENDANTS' PROPOSED SPECIAL INTERROGATORIES FOR THE JURY**<br><br>Re: ECF Nos. 304 and 305 |

The plaintiffs move to strike the testimony of Dr. Michael D. Laufer,[1] and the defendants propose special interrogatories for the jury.[2] The court rules as follows.

**1. Plaintiffs' Motion to Strike Dr. Laufer's Testimony**

    **1.1    Background**

The court addressed the scope of Dr. Laufer's testimony previously.[3] The defendants originally designated Dr. Jon Smith as their forensic pathologist expert.[4] In July 2017, the defendants tried to

---

[1] ECF No. 304. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] ECF No. 305.

[3] Order – ECF No. 193.

[4] Connolly Decl. – ECF No. 191 at 2 (¶ 7).

ORDER – No. 11-cv-04189-LB

contact Dr. Smith to prepare for trial but were unable to reach him.[5] Between July and December 2017, the defendants tried a number of times to contact Dr. Smith without success.[6] On November 30, 2017, the defendants told the plaintiffs for the first time that one of their experts was unavailable and asked about substituting experts.[7] The parties then discussed the possibility of replacing Dr. Smith and limiting the substitute expert's opinions to Dr. Smith's opinions.[8] The plaintiffs proposed (1) stipulating to admitting Dr. Smith's expert report and his deposition or (2) admitting stipulated testimony based on his report.[9] The defendants rejected this proposal because they wanted to present live testimony.[10] The defendants proposed replacing Dr. Smith with Dr. Laufer.

The defendants did not identify Dr. Laufer to the plaintiffs or given them his expert report until after the close of depositions.[11] Additionally, Dr. Laufer's late-disclosed expert report contained opinions that differ materially from Dr. Smith's opinions. One example that the court noted previously is that Dr. Smith testified that he had no way to determine how far Vinh Van Bui was from the police officers' weapons when the police officers shot him.[12] By contrast, Dr. Laufer opined definitively that Mr. Bui was no more than six feet away from the police officers' weapons

---

[5] *Id.* at 3 (¶¶ 13–14).

[6] *Id.* at 3 (¶¶ 15).

[7] *Id.* at 4 (¶ 18); Snell Decl. – ECF No. 189-1 at 2 (¶ 5).

[8] Connolly Decl. – ECF No. 191 at 4–7 (¶¶ 19–20, 24–39); Snell Decl. – ECF No. 189-1 at 2–4 (¶¶ 5–12).

[9] Snell Decl. – ECF No. 189-1 at 2 (¶ 5).

[10] Connolly Decl. – ECF No. 191 at 5–6 (¶ 28).

[11] Snell Decl. – ECF No. 189-1 at 4 (¶ 12).

[12] Order – ECF No. 193 at 2 (citing Smith Dep. – ECF No. 189-2 at 4–5 ("Q. So you made a finding that there is no evidence that the guns were fired closer than two feet from the decedent? A. Again, it's dependent upon the specific type of weapon and the type of ammunition that is used. It may be as close as one foot. It's just a general rule of thumb. So maybe one foot, maybe two feet. Q. Or farther? A. Oh, of course, yes. Q. Could have been 30 feet? A. Correct. Q. The evidence is consistent with 30 feet and it is also consistent, as far as you're concerned, with two feet; isn't that right? . . . . THE WITNESS: In the absence of muzzle imprint, gunpowder soot or stipple, or gunpowder particles, once you get beyond whatever the range is to allow those features to be seen -- in handguns that may be a foot or two feet. Once you get beyond that upper limit of range -- or that lower limit of range, then there is no way to determine whether it's 10 feet or 20 feet or 150 feet.")).

when the police officers shot him.[13] Another example is that Dr. Smith testified that he could not definitively tell the position of Mr. Bui's body when he was shot or whether he was bent over or not.[14] By contrast, Dr. Laufer opined that the first bullet caused Mr. Bui to fall partially backwards,[15] the second bullet paralyzed Mr. Bui's legs, and Mr. Bui's upper torso was angulated forward about 45 degrees when he was hit.[16] These opinions are not in Dr. Smith's report.

The defendants filed a motion to modify the court's case-management order to allow them to substitute Dr. Smith with Dr. Laufer.[17] The plaintiffs opposed, objecting that Dr. Laufer was offering new or different opinions than Dr. Smith and that the defendants were using Dr. Smith's unavailability to get a second bite at the apple about the scope of their expert's opinions.[18]

In similar circumstances, some courts have barred parties from using a late-disclosed expert at all. *See, e.g.*, *Farouk Sys., Inc. v. Chi Nail Franchises, LLC*, No. CV 13-7533 FMO (SHx), 2015 WL 12781705, at *6 (C.D. Cal. Nov. 19, 2015) (excluding late-disclosed expert report even when delay was not done in bad faith and was due to unavailability of original expert). Others have allowed parties to substitute experts but have limited the new expert's testimony to affirming the original expert and his report and nothing more. *See, e.g.*, *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 3:06-cv-1710(VLB), 2009 WL 5184404, at *1, 5 (S.D.N.Y. Dec. 23, 2009) (allowing substitution of expert but "order[ing] that the new expert's testimony at trial will be limited to

---

[13] *Id.* (citing Laufer Proposed Report – ECF No. 189-10 at 2 ("The distance between the muzzles and Bui's chest was between 12 and 72 inches.")).

[14] *Id.* (citing Smith Dep. – ECF No. 189-2 at 6–7 ("Q. What was the angle of the bullet? Where did the gunshot wound go, from where to where? A. Which gunshot wound? Q. Number one. A. Number one went from the mid right chest adjacent to the sternum, or breastbone, and exited the right inferolateral, or right lower side, of the chest. Q. Was it headed down (indicating)? A. Yes. Q. What does that tell you about the position of his body if anything? Was he bent over? A. I can't definitively say that. Q. Is it consistent with him being bent over? A. It may be, yes.")).

[15] *Id.* at 2–3 (citing Laufer Proposed Report – ECF No. 109-10 at 2 ("The energy from the other bullet [bullet 1] most likely caused the decedent to fall partially backward.")).

[16] *Id.* (citing Laufer Proposed Report – ECF No. 109-10 at 2 ("The bullet that embedded in the spine likely had sufficient energy to cause the spinal nerves to fire and caused temporary paralysis of the legs. . . . The angle of the bullet that lodged in the spine appears to be downward toward the floor tracking from upper chest to mid-back. This angle suggests that Bui's upper torso was angulated forward about 45 degrees relative to the plane of the wall.")).

[17] Defs.' Mot. to Modify Case Mgmt. Order – ECF No. 187.

[18] Pls.' Opp'n to Mot. to Modify Case Mgmt. Order – ECF No. 189.

establishing the veracity and integrity of the original expert and the conclusions reached in the original expert's report"). To accommodate the defendants, the court did not elect either route. Instead, it granted the defendants' request to substitute their expert and to allow their new expert, Dr. Laufer, to provide live testimony at trial. The court expressly ordered, however, that "Dr. Laufer will not be permitted to offer . . . opinions different from or in addition to those that were offered by Dr. Smith."[19] The court warned the defendants that "[s]hould Dr. Laufer provide a report or otherwise offer expert opinions that are different from or in addition to those offered by Dr. Smith, the court will entertain an appropriate motion, including a motion to exclude those opinions and/or a motion for appropriate cost[s] and fees."[20]

### 1.2 Trial Testimony

Despite this warning, at trial, the defendants put on Dr. Laufer and elicited a number of opinions different from or in addition to those offered by Dr. Smith. Among other things, the defendants elicited the two opinions that the court previously held were impermissible deviations from Dr. Smith's report: (1) Mr. Bui was no more than six feet away from the officers when he was shot and (2) Mr. Bui was bent over when he was shot.

#### 1.2.1 Distance

Dr. Smith, in his deposition, testified that he could not tell how far away Mr. Bui was from the officers when he was shot — possibly 10 feet away, possibly 20, or possibly 150:

> Q. So you made a finding that there is no evidence that the guns were fired closer than two feet from the decedent?
>
> A. Again, it's dependent upon the specific type of weapon and the type of ammunition that is used. It may be as close as one foot. It's just a general rule of thumb. So maybe one foot, maybe two feet.
>
> Q. Or farther?
>
> A. Oh, of course, yes.
>
> Q. Could have been 30 feet?
>
> A. Correct.

---

[19] Order – ECF No. 193 at 4.

[20] *Id.*

> Q. The evidence is consistent with 30 feet and it is also consistent, as far as you're concerned, with two feet; isn't that right?
>
> MR. MARGOLIS: Objection. Vague. What evidence are you referring to? Just the clothing and the skin?
>
> MR. SCHWARTZ: The autopsy evidence.
>
> THE WITNESS: In the absence of muzzle imprint, gunpowder soot or stipple, or gunpowder particles, once you get beyond whatever the range is to allow those features to be seen -- in handguns that may be a foot or two feet . Once you get beyond that upper limit of range -- or that lower limit of range, then there is no way to determine whether it's 10 feet or 20 feet or 150 feet.[21]

Despite this, Dr. Laufer testified definitively that Mr. Bui was no more than five feet away from the officers when they shot him.[22] (This not only contradicts Dr. Smith's testimony, but also, it contradicts Dr. Laufer's own report, where he opined without explanation that Mr. Bui was between one and *six* feet away from the officers when he was shot.[23]) After offering this opinion, Dr. Laufer justified it by talking about the putative physical constraints of the room dimensions (although Dr. Laufer was not admitted as an expert on that topic, and it is a disputed fact where Mr. Bui was when he was shot) and the bullet trajectories (which are not linked to the distance between the officers' guns and Mr. Bui in either Dr. Smith's report or Dr. Laufer's report).

### 1.2.2 Bent over

Dr. Smith, in his deposition, testified that he "c[ould]n't definitively say" that Mr. Bui was bent over when he was shot.[24] Despite this, at trial, Dr. Laufer opined definitively that Mr. Bui was bent over when he was shot:

> Q. Do you have an opinion as to the position of the body at the time the Gunshot No. 2 was shot?

---

[21] Smith Dep. – ECF No. 189-2 at 4–5.

[22] Trial Tr. 1443.

[23] Laufer Proposed Report – ECF No. 189-10 at 2 ("The distance between the muzzles and Bui's chest was between 12 and 72 inches.").

[24] Smith Dep. – ECF No. 189-2 at 6 ("Q. What was the angle of the bullet? Where did the gunshot wound go, from where to where? A. Which gunshot wound? Q. Number one. A. Number one went from the mid right chest adjacent to the sternum, or breastbone, and exited the right inferolateral, or right lower side, of the chest. Q. Was it headed down (indicating)? A. Yes. *Q. What does that tell you about the position of his body if anything? Was he bent over? A. I can't definitively say that.* Q. Is it consistent with him being bent over? A. It may be, yes.") (emphasis added).

> A. I do.
>
> Q. What is it?
>
> A. Bent over further, so that at the -- at the level of the waist, the body was about 45 degrees, relatively to either the floor or the wall.[25]

The plaintiffs objected,[26] and the court held an extended sidebar. The court warned the defendants, "You just can't go beyond Dr. Smith's report. It's not fair, and it violates the order."[27] The court provided the defendants with another accommodation and allowed them to ask Dr. Laufer about bullet trajectories, trigonometry, and geometry,[28] even though this was not discussed in Dr. Smith's report.[29] But the court warned the defendants again, "Dr. Smith testified specifically: 'I . . . [c]an't definitively say'" whether Mr. Bui was bent over and "you can't elicit a new opinion from [Dr. Laufer]."[30] Even after this sidebar, however, Dr. Laufer continued to opine definitively that Mr. Bui must have been bent over when he was shot:

> Q. . . . And the reason you say the trajectory is consistent with him being bent over is because in order for that trajectory to be what it is, *he must have been bent at the waist at some angle*.
>
> A. *Essentially, yes.*
>
> Q. Okay. And presumably there are other positions he could have been in. That's not to suggest he was standing there bent at the waist, but there are other positions like that.
>
> A. Well, if he were floating, for instance, with his feet off the ground (Indicating), you could accomplish this angle as well. But --
>
> Q. Because he would be bent forward (Indicating)?
>
> A. Because his body would essentially be tilted toward the front (Indicating). But given that all of the evidence I have seen says that he was not floating up off the ground (Indicating), the only other way you could create that geometry is for him to be bent forward.
>
> Q. Nor was there testimony that he was on his knees or in any other sort of crouched position?

---

[25] Trial Tr. 1400.

[26] *Id.*

[27] *Id.* at 1407.

[28] *Id.* at 1408.

[29] *See* Smith Rep. – ECF No. 191-1 at 2–4.

[30] Trial Tr. at 1411–12.

ORDER – No. 11-cv-04189-LB  6

A. None of those would result in the correct angles.[31]

These opinions are not in Dr. Smith's report, and they contradict Dr. Smith's deposition testimony.

### 1.3 Analysis

The court previously ordered that Dr. Laufer could not offer opinions different from or in addition to Dr. Smith's opinions. "[T]he purpose of allowing substitution of an expert is to put the movant in the same position it would have been in but for the need to change experts; it is not an opportunity to designate a better expert." *In re Northrup Grumman Corp. ERISA Litig.*, No. CV 06-06213-AB (JCx), 2016 WL 6826171, at *4 (C.D. Cal. Apr. 7, 2016) (quoting *United States ex rel. Agate Steel, Inc. v. Jaynes Corp.*, No. 2:13-CV-01907, 2015 WL 1546717, at *2 (D. Nev. Apr. 6, 2015)). Dr. Laufer's testimony violated the court's order and expressed opinions that were new or different from those offered by Dr. Smith, in a way that was prejudicial to the plaintiffs.[32]

The court previously gave the defendants fair warning that "[s]hould Dr. Laufer provide a report or otherwise offer expert opinions that are different from or in addition to those offered by Dr. Smith, the court will entertain an appropriate motion, including a motion to exclude those opinions[.]"[33] Given the violation of the court's order, that remedy is appropriate here. The court grants the plaintiffs' motion to strike Dr. Laufer's testimony in part and strikes Dr. Laufer's testimony with respect to (1) how far Mr. Bui was from the officers when he was shot and (2) what position he was in when he was shot. The court will instruct the jury that they must

---

[31] *Id.* at 1437–38 (emphasis added).

[32] With respect to Dr. Laufer's testimony that Mr. Bui was bent over when he was shot, the defendants claim that Mr. Bui's autopsy report contains information about various bullet trajectory angles and that the autopsy report was attached to Dr. Smith's original expert report, and hence Dr. Laufer can offer an opinion that Mr. Bui was bent over based on the autopsy report. *See* Trial Tr. 1407–08. This argument fails. If anything, this argument just proves the point that Dr. Laufer is offering new opinions in violation of the court's order. Dr. Smith reviewed the autopsy report, which would include whatever information the report contained about bullet trajectories. Even after reviewing the report, Dr. Smith explicitly testified that "c[ould]n't definitively say" whether Mr. Bui was bent over or not. Smith Dep. – ECF No. 189-2 at 6. The fact that Dr. Smith happens to now be unavailable does not entitle the defendants to have Dr. Laufer take a fresh look at the same autopsy report that Dr. Smith reviewed and, from that same report, suddenly reach a new conclusion about Mr. Bui's being bent over that Dr. Smith could not.

[33] *Id.*

disregard that testimony. The defendants may not make any reference to Dr. Laufer's testimony in connection with those two subjects. (The defendants can make arguments about those subjects based on other admitted evidence — e.g., they can argue about the distance Mr. Bui was from the officers when he was shot based on admitted evidence about room layouts — but they may not refer to Dr. Laufer's testimony on those subjects in any way in their closing arguments.)

**2. Defendants' Proposed Special Interrogatories for the Jury**

There is no requirement that district courts must provide special interrogatories to a jury in qualified immunity cases involving disputed issues of material fact. *Lam v. City of San Jose*, 869 F.3d 1077, 1086 (9th Cir. 2017) (citing *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 521 (9th Cir. 1999)); *accord* Ninth Circuit Model Jury Instruction 9.34 Comment ("Consistent with this case law, there may be particular cases in which a special verdict on a discrete fact is warranted in order to resolve a qualified immunity claim. But a special verdict is not required in every qualified immunity case involving disputed issues of material fact for the purpose of evaluating a post-verdict qualified immunity defense.").

The Ninth Circuit's recent *Lam* opinion addressed this issue recently in the context of a case that (like the one here) involved police officers who responded to a 911 call, saw an individual with a knife, and shot him. The plaintiff in that case, Hung Lam, had been placed on a psychiatric hold. *Lam*, 869 F.3d at 1081. After being released, Mr. Lam started acting strangely again and began walking around with a knife. *Id.* A neighbor called 911. *Id.* When the police arrived on the scene, they ordered Mr. Lam to drop the knife and get on the ground. *Id.* at 1081–82. Mr. Lam started making motions with the knife, and a police officer shot him twice in rapid succession. *Id.* at 1082. Mr. Lam, who was rendered a paraplegic, brought a Fourth Amendment claim excessive-force claim and a state-law negligence claim (among other claims). *Id.* at 1083.

The defendant police officer requested that the district court submit special interrogatories to the jury so that the court could rule on her entitlement to qualified immunity. *Id.* at 1084. The district court declined to do so, finding that special interrogatories were unnecessary. *Id.* at 1086. The district court held that if the jury found the plaintiff's version of the facts to be true, then the

police officer would not be entitled to qualified immunity, because it is a violation of clearly established law for an officer to use deadly force against someone who poses no threat of serious harm to the officers or others. *Id.* at 1086. The Ninth Circuit affirmed, holding that "[t]he district court did not abuse its discretion by declining to give special interrogatories based on this rationale." *Id.* The reasoning of *Lam* is sound, and the court adopts it here. The court need not provide special interrogatories, because if the jury finds the plaintiffs' version of the facts to be true, then Officers Wilson and Ortiz would not be entitled to qualified immunity.

The defendants argue that their proposed interrogatories track the Ninth Circuit's ruling on qualified immunity in this case. Not so. What the Ninth Circuit held was, "[i]t was clearly established as of December 2010 that officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others." *Bui v. City and Cty. of San Francisco*, 699 F. App'x 614, 616 (9th Cir. 2017) (citations and internal quotation marks omitted). The defendants' proposed interrogatories do not track the Ninth Circuit's holding. For example, the defendants propose a special interrogatory asking whether Mr. Bui "threaten[ed] Officers Ortiz and/or Wilson or others with the X-Acto knife *at any time* before Officer [Ortiz or Wilson] used lethal force" (emphasis added).[34] This is not necessarily relevant to the qualified-immunity question under the Ninth Circuit's holding. *Bui*, 699 F. App'x at 616 (fact that "the suspect has committed a violent crime in the immediate past" does not mean that he posed an immediate threat to the officers at the time they used lethal force, the relevant question for determining qualified immunity). It is, however, unduly suggestive to the jury regarding Mr. Bui's prior acts. In sum, the interrogatories are suggestive, there is no requirement to give them, and the defendants submitted them late, over two-and-a-half hours after the Sunday at noon deadline that the court set to give it time to resolve issues by Monday morning. The court denies the defendants' proposed interrogatories.

**IT IS SO ORDERED.**

Dated: March 18, 2018

_____
LAUREL BEELER
United States Magistrate Judge

---

[34] Defs.' Proposed Juror Interrogatories – ECF No. 305 at 4.

ORDER – No. 11-cv-04189-LB  9